### THE ATLANTIC CITY.

#### (District Court, D. New Jersey. March 31, 1905.)

COLLISION—STEAM VESSELS MEETING—VIOLATION OF RULES.

Two steam vessels meeting in the Delaware river at night, where the channel was 2,000 feet wide, showing each other their green lights, both signaled their intention to pass starboard and starboard, but neither heard the signal of the other. They continued their course and speed, however, without further signals, until close together, when one, in the mistaken belief that the other gave a signal of one whistle, ported her helm, the result being a collision. *Held*, that both were in fault for violation of rule 3 of the supervising inspectors, which required them, when failing to understand the course or intention of the other, to so signify by signal, and to slow down until an agreement was reached and understood, or until they had passed each other.

[Ed. Note.—Collision rules as to signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

In Admiralty. Suit for collision.

Carpenter & Park, for libelant.

Francis C. Adler, James F. Campbell, and John F. Lewis, for claimant.

LANNING, District Judge. This is a libel for damages occasioned by a collision between the steamboat Sylvan Glen and the steam ferryboat Atlantic City at about 11 o'clock in the evening of August 18, 1896, in the Delaware river opposite the city of Philadelphia. The libel was filed January 23, 1897, and the answer on

March 10, 1897. The libelant's first witness, who was the engineer of the Glen, was not examined until November 6, 1899. The next examination of witnesses for the libelant was on February 1, 1900, when the captain and three employés of the Glen and two of her passengers were examined. The last witness for the libelant was a deck hand, who was examined on January 17, 1901. All of these witnesses, except the last, were in the country and in the vicinity of Philadelphia, and could have been subpœnaed at any time after the collision. The witnesses for the claimant were examined on December 12, 1901, and on January 16, 1902. The proofs are conflicting, and in many respects show the impossibility of the witnesses to recall distinctly material facts in the case. This is not at all surprising, since the examination of the witnesses covered a period between three years and five and a half years after the collision. I think, however, the weight of the testimony establishes the following facts: The Sylvan Glen left Washington Park, below Philadelphia, about ten and a half o'clock in the evening, bound for the Arch Street Wharf, Philadelphia. She passed up the river, somewhat on the Philadelphia side of the middle of the river. When about opposite the South Street Wharf her pilot sighted the Atlantic City coming out from her wharf at Chestnut street, and turning down the river. After straightening out her course, the Atlantic City was about in the middle of the river. Each of the vessels showed to the other her green or starboard light. When they were not over a half mile apart, and while each was showing to the other her green light, each of them gave to the other a signal of two whistles, thus indicating the intention of their respective pilots to pass starboard to starboard. Neither of the pilots heard the signal of the other. Notwithstanding this fact, both of the vessels were continued at full speed without the repetition of any signal, and on the apparent assumption that each vessel would continue to show her green light to the other, and that they would pass each other on their starboard sides. After they had reached a position of probably not more than 300 feet apart, the Glen, as all her witnesses admit, suddenly ported her wheel, and sheered across the Atlantic City's bow. Almost instantly it became evident that there was danger of collision, and the engines of both vessels were stopped and reversed, but too late to prevent a collision. The Atlantic City struck the Glen near her port bow. Had the two vessels continued their original courses, they would have passed starboard to starboard without danger of collision. The pilot of the Glen says that the Atlantic City, after first showing her green light to the Glen, gave a signal of one blast, starboarded her course, and then, after the Glen had starboarded her course, the Atlantic City ported her course, and "chased" the Glen about the river, and thus caused the collision. The weight of evidence satisfies me that the Atlantic City continued her course with a steady wheel, and that the pilot of the Glen is mistaken in his statement that the Atlantic City in any wise altered her course. The pilot of the Glen further says that he ported his wheel and attempted to pass

on the port side of the Atlantic City because of a signal of one blast given to him by the Atlantic City. In this statement the pilot of the Glen is also clearly mistaken. It appears that a steam tug with a car float in tow was crossing the river from Camden to Philadelphia ahead of the Glen. The pilot of the tug says that as he was crossing the river the Atlantic City crossed his bow, and just as the Atlantic City was so doing the Glen gave a blast of one whistle, which he (the pilot of the tug) understood to be for him, and that he responded to it with one blast. By these signals the pilot of the tug understood that the Glen would pass to the stern of the tug. The pilot of the Atlantic City and other witnesses declare that the Atlantic City gave no signal of one blast, and it is quite clear to me that the pilot of the Glen mistook the signal of the tug for the signal of the Atlantic City. The collision occurred a little to the Camden side of the middle of the river, at a point where the river is about 2,000 feet in width.

Such being the material facts of the case, it seems to me that both vessels were at fault. The channel of the river was not so narrow at that point as to require the enforcement of article 21 of the revised international regulations contained in chapter 354 of the Laws of 1885 (23 Stat. 442), which article is as follows:

"In narrow channels every steamship shall when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such ship."

Rule 3 of the board of supervising inspectors, in force at the date of the collision, is as follows:

"If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered, and understood, or until the vessels shall have passed each other."

The proper observance of this rule would have prevented any collision. Neither pilot was properly discharging his duty when he continued on his course with unabated speed after having given his signal of two blasts without having received any response from the other vessel, and without having ascertained the intention of the other vessel. Had either vessel repeated its signal, the error of the pilot of the Glen resulting from the signal given by the tugboat would doubtless not have been made.

I find, therefore, that, as there was fault on the part of both vessels, there must be a division of the damages equally between the two vessels. There will be a decree to this effect, with reference to a commissioner to take testimony.